# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# URBANA DIVISION

| | |
|---|---|
| **SMOKEY DILLON STUDEBAKER,** ) <br> ) <br> **Plaintiff,** ) <br> v. ) <br> ) <br> **COUNTY OF MACON, ILLINOIS, and** ) <br> **THOMAS P. SCHNEIDER, as Sheriff of** ) <br> **Macon County,** ) <br> ) <br> **Defendants.** ) | **Case No. 12-CV-2187** |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#21) filed by Defendants County of Macon, Illinois, and Thomas P. Schneider, as Sheriff of Macon County. This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, Defendants' Motion for Summary Judgment (#21) is GRANTED.

## FACTS[1]

Plaintiff, Smokey Dillon Studebaker, was arrested on June 3, 2011, and charged with driving under the influence of marijuana. Plaintiff was booked into the Macon County Jail at 1:08 p.m. Plaintiff was placed in Trod 3, Pod D (Pod D). Pod D is intended for inmates classified as misdemeanor inmates. During the intake

---

[1] The facts are taken from Defendants' statement of Undisputed Material Facts, Plaintiff's statement of Additional Material Facts and the documents submitted by the parties, including the transcript of Plaintiff's deposition. This court has only included facts which are material to the issues raised and are adequately supported by evidence in the record.

process, Plaintiff received a copy of the Macon County Jail Inmate Handbook, which contains a number of rules, regulations and procedures intended to ensure, among other things, the safety of inmates. The Handbook states that the Sheriff's Office maintains a zero tolerance policy with respect to physical harassment. Inmates are prohibited from engaging in certain rule infractions, including assault and battery, causing or being involved in any disturbance, blocking the view of officers, creating excessive or unnecessary noise, and violating state, federal or local law.

If inmates have a request for the staff at the Macon County Jail, they are directed to address their written requests to the staff members designated to handle the request. At booking, Plaintiff received a copy of the Inmate Request Form which was to be used by inmates if they wished to speak with employees of the Jail about certain matters. On June 6, 2011, Plaintiff followed the procedures set forth in the Inmate Handbook and completed an Inmate Request Form, asking for a hygiene pack. Plaintiff was provided the requested supplies on June 8, 2011.

While housed in Pod D, Plaintiff had two verbal altercations with other inmates. The first altercation took place on June 13, 2011. At that time, Correctional Officer Jordan heard loud voices coming from Pod D, turned the camera and intercom to the top deck and observed Plaintiff and another inmate in a verbal argument, displaying aggressive posture toward one another. In an effort to prevent

a physical altercation, Jordan called for escorts to remove the inmates and diffuse the situation. Plaintiff was placed in deadlock for 48 hours. The second altercation took place on July 6, 2011. Correctional Officer Acup heard a commotion coming from Pod D and saw several inmates standing on the stairway. Upon approaching the window, Acup saw Plaintiff and another inmate arguing and facing off in what appeared to be a possible fight. Acup called for escorts and removed the two inmates, separating them from one another.

Following the July 6, 2011 incident, Correctional Officer Tirpak found out that Plaintiff had been incarcerated in the Illinois Department of Corrections with a felony history and decided to move Plaintiff to Trod 3, Pod C (Pod C). Tirpak testified at his deposition that Plaintiff was moved as "a remedial measure for his behavior."

Approximately one week after his transfer to Pod C, Plaintiff submitted a written request to an unknown correctional officer, indicating that he wished to speak with a correctional officer as soon as possible. Plaintiff was familiar with the procedure on how to communicate his requests with correctional officers through the Inmate Request Forms as he had completed such forms during two prior periods of incarceration and on June 6, 2011. After receiving Plaintiff's written note, an unknown correctional officer came to speak with Plaintiff and told him to write

3

down on a piece of paper exactly what was going on. Plaintiff wrote that he wanted to be transferred to a different pod because he feared for his life. That same night, Plaintiff submitted a piece of paper (not an inmate request form) to another correctional officer stating that he did not feel safe for his life in his current pod and asked to be moved. Plaintiff testified that he received no response to his written requests.

On July 21, 2011, Plaintiff and the other inmates in Pod C went into their cells at 10:00 p.m. Normally, people would talk for a while until they went to sleep, but on that night, an inmate by the name of Saquavis Smith was banging on the walls and rapping at his door. Other inmates asked Smith to settle down and go to bed, but Smith told them no. Smith continued to make noise until 2:00 a.m. At that time, Plaintiff asked Smith to have consideration for the other inmates because they were trying to sleep and did not want to hear the ruckus he was making. Smith replied, "F-you, we don't sleep in cell - - so-called cell, whatever number it is, if you don't like it, bond out." Plaintiff responded, "Man, that is kind of messed up, man. Grow up."

That morning, July 22, 2011, at roughly 8:00 a.m., Smith approached Plaintiff and asked if Plaintiff was the individual who called him a bitch the night before. Plaintiff replied that he was. Smith then threatened Plaintiff and told him what he

4

was going to do to him. Despite this threat, Plaintiff did not think that Smith would physically attack him. Plaintiff knew that if he wanted to seek the assistance of the correctional officers, he would only need to press the button in the pod and tell them his story. Plaintiff also knew that he could go to the viewing window at the edge of the pod and make a hand signal or say something to the officer monitoring the situation if he needed help. Moreover, Plaintiff was aware that there was an alarm button near the viewing window that Plaintiff could have pressed had he wanted to seek assistance. Plaintiff did not seek the assistance of any correctional officers after Smith's threat.

Plaintiff ate his breakfast and laid down on his mat. He did not see Smith during this time though he knew Smith was in the same vicinity. At approximately 8:30 a.m., Smith shoved or kicked the mattress Plaintiff was on. Smith told Plaintiff to "go into the cell." Smith did not physically force him into the cell, but Plaintiff testified that he felt he was forced to go into his cell. Plaintiff testified that he fully anticipated that a cell fight would take place and that he was willing to undergo a one-on-one cell fight with Smith. Plaintiff testified that he elected to participate in this fight. There are alarm buttons in each cell above the bed. Plaintiff did not use the alarm button during the altercation and testified that he had no intention of using it even if he could have done so.

5

Plaintiff was initially able to handle Smith, and was actually getting the better of him, when just the two of them were fighting. He fought Smith alone for three or four seconds before another man, later identified as Elliot Murphy, walked into the cell and joined Smith in fighting Plaintiff. The video of the incident shows that another inmate, Emerson Burns, closed the cell door once Plaintiff, Smith and Murphy were inside the cell and stood outside as a lookout. Plaintiff fought Smith and Murphy inside of the cell for approximately 26 seconds, from the time he walked into the cell until the fight was over. Smith and Murphy then left the cell. Plaintiff walked out of the cell five or six seconds later and yelled at Smith, "I fight my own fights, why don't you?" Plaintiff realized he was bleeding and went into the shower. When the bleeding did not stop, he pushed the alarm near the viewing window. A correctional officer arrived in about 30 seconds. Plaintiff was taken to the hospital for medical treatment but lost his right eye.

Plaintiff had not had a problem with Smith, Murphy or Burns prior to this incident. It is undisputed that Sheriff Schneider had no involvement in any events which took place during Plaintiff's incarceration at the Macon County Jail. Schneider never met Plaintiff and was never told by any correctional officer that Plaintiff provided a letter stating that he was concerned for his safety.

PROCEDURAL HISTORY

On July 13, 2012, Plaintiff filed a Complaint against Defendants in the circuit court of Macon County. On July 25, 2012, Defendants filed a Notice of Removal (#1) and removed the case to this court. On October 18, 2012, Plaintiff filed an Amended Complaint (#15) brought pursuant to 42 U.S.C. § 1983 for violation of his civil rights. In Count One, Plaintiff alleged that Defendant County of Macon exhibited and displayed a deliberate indifference for the safety and well being of Plaintiff. He alleged that the County of Macon acted with reckless disregard for his safety in one or more of the following respects:

- A. Failed to conduct reasonable monitoring of Plaintiff so as to ensure the physical well being of Plaintiff;
- B. Failed to monitor its inmates to prevent injury to the Plaintiff, when it knew or should have known that the said inmates posed a substantial risk of danger and that the Plaintiff faced a substantial risk of harm;
- C. Failed to adhere to agency or department policy concerning the protection of an inmate who has a reasonable fear for his own safety;
- D. Deprived the Plaintiff of his ability to protect himself, and

failed to provide adequate protection of the Plaintiff.

In Count Two, Plaintiff alleged that Defendant Schneider exhibited and displayed a deliberate indifference for the safety and well being of Plaintiff and that "it was the policy and custom of the Macon County Jailhouse not to meet with or attend to the safety of its inmates, despite receiving written concerns like those delivered to the correctional officers by the Plaintiff."

On March 14, 2014, Defendants filed a Motion for Summary Judgment (#21) and a Memorandum in Support (#22) with attached exhibits. Defendants argued that Defendant County of Macon is entitled to summary judgment because the County is not a proper Defendant as it is a separate legal entity from the Macon County Sheriff's Office, having no involvement in setting the policies, practices, or customs within the Macon County Jail. Defendants argued that Schneider, sued in his official capacity as Sheriff of Macon County, is entitled to summary judgment because Plaintiff is unable to present any evidence that there existed a policy, practice, or custom of the Sheriff's Office of not "meet[ing] with or attend[ing] to the safety of inmates, despite receiving written concerns like those delivered to the correctional officers by Plaintiff." Defendants also argued that Plaintiff has alleged no violation of his constitutional rights, as a matter of law.

On April 7, 2014, Plaintiff filed his Response in Opposition to Defendants'

Motion for Summary Judgment (#26) and a Memorandum in Opposition (#27) with attached exhibits. Plaintiff did not respond to Defendants' argument that the there is no basis for imposing liability on the County of Macon. Plaintiff argued, however, that there is a genuine issue of material fact concerning whether the existence of a pattern, practice, or custom that resulted in a violation of Plaintiff's constitutional rights is so widespread or persistent it rises to the level of a policy which is attributable to the municipality. Plaintiff argued that the evidence shows that several correctional officers treated Pod D as a honor dorm, rather than as a misdemeanor dorm, which resulted in misdemeanor inmates being moved out of the misdemeanor dorm and into the felony pod as punishment or a remedial measure. Plaintiff argued that this custom, policy and practice resulted in him being moved into a felony pod with dangerous felony inmates, resulting in an assault upon him by these dangerous felony inmates. Plaintiff also argued that there was a pattern, practice or custom of ignoring inmates' written concerns, simply because they were placed on an inappropriate form.

On April 22, 2014, Defendants filed their Reply (#29) and Exhibits in Support (#30). Defendants argued that Plaintiff's arguments are entirely without merit. The Motion for Summary Judgment is fully briefed and ready for ruling.

ANALYSIS

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *Singer*, 593 F.3d at 533, *quoting Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). Specifically, to survive summary judgment, "the nonmoving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), *citing Celotex Corp.*, 477 U.S. at 322-23.

PLAINTIFF'S CLAIMS

In this case, Plaintiff has sued the County of Macon and Schneider, as Sheriff of Macon County, under 42 U.S.C. § 1983, alleging the violation of his constitutional rights. Because the July 22, 2011 incident occurred when Plaintiff was a pre-trial detainee, his claim is under the Due Process Clause of the Fourteenth Amendment. *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008). "The protections for pre-trial detainees [under the Fourteenth Amendment] are at least as great as the Eighth Amendment protections available to a convicted prisoner," and the Seventh Circuit "frequently consider[s] the standards to be analogous." *Klebanowski*, 540 F.3d at 637, *quoting Washington v. LaPorte Cnty. Sheriff's Dept.*, 306 F.3d 515, 517 (7th Cir. 2002). "It is well-settled that both Amendments impose upon prison officials a duty to protect inmates from violent assaults at the hands of fellow prisoners." *Klebanowski*, 540 F.3d at 637, *citing Farmer v. Brennan*, 511 U.S. 825, 833 (1994). However, "the duty is violated only by deliberate indifference to a known substantial risk." *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013). An official violates that duty "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *Klebanowski*, 540 F.3d at 637. A plaintiff must show that an official had actual knowledge of an impending harm easily preventable, so that a conscious,

culpable refusal to prevent the harm can be inferred from a defendant's failure to prevent it. *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010).

In this case, Plaintiff's suit is against the County of Macon and Sheriff Schneider, not against any individual correctional officers   In order to maintain a § 1983 claim against a governmental entity, as opposed to an individual defendant, Plaintiff must demonstrate that his constitutional rights were violated by some official policy or custom of that entity. *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978). A local governmental entity may not be sued under § 1983 for an injury inflicted solely by its employees or agents. *Monell*, 436 U.S. at 694. A governmental entity "cannot be held liable under Section 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

"[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by municipal policymakers. *Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012), *quoting City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). "An official policy or custom may be established by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality."

*Rice*, 675 F.3d at 675. A plaintiff must also show a direct causal connection between the policy or practice and the injury, in other words that the policy or custom was the "moving force [behind] the constitutional violation." *Rice,* 675 F.3d at 675, *quoting Harris*, 489 U.S. at 389. "It is well established that there can be no municipal liability on an official policy under *Monell* if the policy did not result in a violation of [a plaintiff's] constitutional rights." *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008), *quoting King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007). In addition, proof of an isolated unconstitutional incident is insufficient to impose liability against a governmental entity under *Monell*. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985).

Plaintiff has not countered Defendants' argument that there is no basis for imposing municipal liability on the County of Macon. This court therefore agrees that summary judgment should be granted in favor of the County of Macon. Accordingly, this court will consider Plaintiff's arguments as relating to Defendant Schneider only.

Plaintiff has argued that genuine issues of material fact exist regarding whether Defendant Schneider is liable for Plaintiff's injuries. Plaintiff does not contend that there was an express policy that caused his injuries or that the actions of an individual who possessed the authority to make final policy decisions caused

13

his injuries. Plaintiff has, instead, contended that his injuries were caused by a widespread practice. Plaintiff first argued that the evidence shows that several correctional officers treated Pod D as a honor dorm, rather than as a misdemeanor dorm, which resulted in misdemeanor inmates being moved out of the misdemeanor dorm and into the felony pod as punishment or a remedial measure. Plaintiff argued that this custom, policy and practice resulted in him being moved into a felony pod with dangerous felony inmates. Plaintiff argued that the result was an assault upon him by these dangerous felony inmates.

In their Reply, Defendants argued that there are numerous problems with this argument. Defendants argued that Plaintiff's new allegations regarding the Sheriff's Office's classification policy should be stricken because Plaintiff cannot amend his Complaint in response to Defendants' Motion for Summary Judgment. Defendants also argued that the evidence does not support the existence of such a policy. Finally, Defendants argued that, even if the court allowed Plaintiff to bring a new claim challenging the Jail's classification policy, there is nothing unconstitutional about placing someone charged with a misdemeanor offense in the same pod as someone charged with a felony.

This court agrees that the evidence does not support Plaintiff's claim of a widespread practice which resulted in him being transferred into a felony pod. As

pointed out by Defendants, the evidence shows that some correctional officers referred to Pod D as the "honor pod" because that was what it was historically called when it previously housed trustees, before it was used to house misdemeanor inmates. Tirpak was the only correctional officer who testified that he treated Pod D as an "honor pod." Tirpak made the decision to transfer Plaintiff and he made the decision because of Plaintiff's behavior in being involved in two verbal altercations while housed in Pod D and because Plaintiff had a prior felony history.[2] This evidence falls far short of establishing a "custom or policy" to transfer misdemeanor inmates to a pod housing felony inmates.

Moreover, Defendants are correct that there is no evidentiary support for Plaintiff's argument that he was moved where there were "dangerous felony inmates." Plaintiff presented no evidence to support his claim that any officer was aware that felons posed a substantial risk of violence to misdemeanor offenders because of their status, and Tirpak testified that there was no increased risk in placing Plaintiff with felony offenders. In making his argument, Plaintiff relied

---

[2] Even if there were support for Plaintiff's argument that Tirpak's transfer decision violated his constitutional rights, Plaintiff did not sue Tirpak and there is no basis for imposing liability on Defendant Schneider. Proof of an isolated unconstitutional incident is insufficient to impose liability against a governmental entity. *See Tuttle,* 471 U.S. at 824. "When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003), *citing Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995).

solely on the deposition testimony of Correctional Officer Lange. Lange testified that misdemeanor offenders are housed with other misdemeanor offenders so they don't have to put them with felony inmates. Lange testified that he "guess[ed]" that this was because "you can consider felony inmates to be more dangerous." Lange also testified that he did not deal with classification of inmates at the Macon County Jail. This court agrees with Defendants that Lange's testimony can only be considered speculative and is also irrelevant because Lange did not have any involvement with the classification of inmates. Lange's testimony is not sufficient to show that there was an increased risk to Plaintiff when Plaintiff was moved to Pod C.

In fact, Defendants are correct that the Seventh Circuit has specifically rejected very similar arguments. In *James v. Milwaukee Cnty.*, 956 F.2d 696 (7th Cir. 1992), the plaintiff was housed in the Milwaukee County House of Correction. While there, another inmate attacked him and broke his neck, rendering him a quadriplegic. *James*, 956 F.2d at 697. The plaintiff argued that the County's inmate classification system, under which parole violators and probation violators were housed in the same open dormitories without regard to criminal history, constituted cruel and unusual punishment under the Eighth Amendment. *James*, 956 F.2d at 697. The plaintiff alleged that he was deprived of the right to physical safety. *James*, 956 F.2d

16

at 699. The plaintiff claimed that Milwaukee's prisoner classification system created a pervasive risk of violence, which the defendants ignored. *James*, 956 F.2d at 700. The Seventh Circuit rejected this argument, noting that the plaintiff offered "no concrete proof, such as statistical or comparative evidence, to show this policy resulted in increased inmate violence." *James*, 956 F.2d at 701. The court stated:

> Indeed, the record is void of a single other instance in this prison, or any other prison, where an inmate attack was attributable to the policy of housing parole violators with probation violators. James failed to show a causal relationship between the challenged policy and the particular constitutional deprivation alleged, here physical safety.

*James*, 956 F.2d at 701.

In addition, in *Smith*, the Seventh Circuit recently rejected a similar claim that the Sheriff Department's classification system did not do enough to separate violent from nonviolent inmates. *Smith*, 715 F.3d at 192. The court found there was no evidence that the classification policy created a serious risk of physical harm to inmates, much less that the Sheriff's Department knew of it and did nothing. *Smith*, 715 F.3d at 192. The court in *Smith* stated:

> Finally, it is not at all clear that a policy strictly separating inmates

> based on their current charge—segregating those accused of nonviolent crimes from those accused of violent crimes—would do a better job of ensuring inmate safety than the multiple-factor classification system used by the Sheriff's Department. An inmate jailed on a nonviolent charge may have a lengthy rap sheet of violent convictions or an institutional disciplinary record. These additional factors may suggest a need for maximum-security placement but would be overlooked by a policy that focused exclusively or even primarily on the nature of the offense that brought the inmate to the jail.

*Smith*, 725 F.3d at 194.

In this case, Plaintiff's argument appears to be that the Sheriff's policy was unconstitutional because it allowed inmates charged with misdemeanor offenses to sometimes be placed in a pod with inmates charged with felony offenses. Like the situation in *James* and *Smith*, Plaintiff presented no evidence which could support a causal relationship between this alleged policy and the particular threat of harm to him. In fact, this court concludes that *Smith* essentially forecloses Plaintiff's claim. The court in *Smith* made clear that in order to proceed against the Sheriff's Department on this type of claim, a plaintiff needs to show that, by following its

classification policy, the Department was deliberately indifferent to a serious risk to the plaintiff's safety. *Smith*, 715 F.3d at 193. Plaintiff has not presented any evidence which could support his contention that, by placing a misdemeanor offender, with a felony history, in the same pod as felony offenders, the Sheriff's office was deliberately indifferent to a serious risk to Plaintiff's safety. This court therefore concludes that summary judgment must be granted on this claim.

Plaintiff also argued that there was a pattern, practice or custom of ignoring inmates' written concerns, simply because they were placed on an inappropriate form. This court agrees with Defendants that this claim fails as well.

Plaintiff testified that he gave unnamed correctional officers two written statements which said that he wanted to be moved because he feared for his life and did not feel safe. Plaintiff did not testify that he provided any additional information in his written statements.[3] Plaintiff's claim is that the Jail's policy of not responding to such requests because they were not on the proper form caused a violation of his constitutional rights. Even assuming that Plaintiff could establish the existence of such a policy, it is clear that failing to respond to such general, unspecific requests was not a violation of Plaintiff's constitutional rights.

The Seventh Circuit has held that statements like those made by Plaintiff are

---

[3] There is no dispute that Plaintiff did not provide any information about Smith, Murphy or Burns because he had not had a problem with them until the day of the incident.

19

insufficient to alert officers to a specific threat. *See Klebanowski*, 540 F.3d at 639 (the plaintiff's statements that he was afraid for his life and wanted to be transferred off the tier not sufficient to show that the officers were aware of any risk to him); *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (not sufficient that the plaintiff told jail officials only that he was afraid and that he wanted to be moved); *Butera v. Cottey*, 285 F.3d 601, 606 (7th Cir. 2002) (prisoner's statements that he "was having problems in the block" and "needed to be removed" insufficient to establish deliberate indifference). This court therefore concludes that summary judgment is warranted on this claim.

IT IS THEREFORE ORDERED THAT:

(1) Defendants' Motion for Summary Judgment (#21) is GRANTED. Judgment is entered in favor of Defendants and against Plaintiff.

(2) Plaintiff's Motion to Bar Defendants' Expert (#23) and Defendants' Motion to Strike Plaintiff's Motion to Bar (#25) are therefore MOOT.

(3) The final pretrial conference scheduled for September 5, 2014, and the jury trial scheduled for September 30, 2014, are VACATED.

(4) This case is terminated.

ENTERED this 23rd day of July, 2014.

s/COLIN S. BRUCE
U.S. DISTRICT JUDGE